Dianna BRANDBORG

v.

Weldon LUCAS.

Civ. A. No. 4:94cv228.

United States District Court,
E.D. Texas,
Sherman Division.

June 16, 1995.

Harold Frederick Hagen, Jackson & Hagen, Denton, TX, for petitioner.

Joe Doyle Bridges, Asst. Dist. Atty., Denton County Sheriff's Dept., Denton, TX, for respondent.

### MEMORANDUM OPINION

FAULKNER, United States Magistrate Judge.

Petitioner Dianna Brandborg submitted the above-styled petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner is challenging a conviction for contempt, a sentence of three days in jail, and a $200 fine imposed upon her by the 211th District Court of Denton County, Texas on February 7, 1994.

On January 27, 1995, the parties consented to the disposition of the petition before this court pursuant to 28 U.S.C. § 636(c)(1).

### Factual and Procedural History

A Denton County Grand Jury indicted James Lee Clark for the capital murder of two Denton teenagers, Shari Catherine Crews and Jesus Gilberto Garza, in cause no. F–93–0713–C styled *The State of Texas v. James Lee Clark.* The 211th District Court summoned a jury panel for Clark's capital murder trial. Included with the summons was a jury questionnaire. The questionnaire asked the potential jurors approximately 110 separate questions and asked if the potential juror had any personal association with the 115 potential witnesses.

Petitioner received the questionnaire on January 1, 1994. Petitioner answered almost all of the questions but found twelve of the questions to be of a private nature. Petitioner could not understand how the twelve questions at issue would be of any relevance to a criminal trial. Petitioner noted the accompanying instructions did not allow her to consult with anyone concerning responses to the questionnaire. Petitioner consulted a copy of the United States Constitution and decided to seek guidance from the court concerning the twelve questions based upon her perceived right to privacy.

On January 3, 1994, petitioner returned the questionnaire to the Honorable Sam Houston, presiding judge of the 211th District Court. Petitioner attached a letter in which she informed the court:

> I found some of the questions to be of a very private nature, and in my opinion, having no relevance to my qualifications as a potential fair and impartial juror. Therefore, I did not respond to those questions. I respectfully request your consideration in this matter.

Petitioner's questionnaire contained answers to all questions posed except for the following queries:

What was your combined family income last year? $ N/A [1]

Religious preference (please name denomination and specific church you attend): N/A

With which political party are you primarily associated: N/A

Do you consider yourself a liberal, a conservative or a moderate? N/A

What television shows do you watch regularly? N/A

Which magazines and newspapers do you subscribe to or read regularly? N/A

What type of vehicle(s) do you drive? N/A

To what clubs, unions, societies, fraternal or political organizations, professional associations or other organizations do you belong, and what offices held? N/A

If you do volunteer work, please indicate the organizations and your involvement: N/A

What reading material do you routinely read? N/A

Have you, your spouse, a relative or close friend ever been represented by either Richard S. Podgorski or Henry C. Paine, Jr.? Yes ( ) No ( ) [2]

Are you presently under the care of a physician or taking any medication? Yes ( ) No ( ) N/A

Have you or any member of your family been a member of the National Rifle Association or any local gun, pistol or hunting club? Yes ( ) No ( ) N/A

On January 19, 1994, the trial court swore in all the potential jurors, including petitioner, and issued general instructions. On February 7, 1994, the trial court conducted individual voir dire which included a hearing on petitioner's refusal to answer the thirteen questions contained in the jury questionnaire. Clark's attorney, Richard Podgorski, stated:

the juror explains in her letter that she thinks some of these questions are very private, and she didn't answer them. I want to ask that the Court compel her to answer the questions as propounded in this questionnaire.

The court replied "Well, I will do so." Petitioner was then brought into court. The judge swore in petitioner again and administered several statutory juror qualifications to petitioner. Petitioner answered all the statutory questions. The court then made reference to the unanswered questions stating:

I'm afraid I'm going to have to order you to answer those. I understand—now, these are kept very, very secret. I don't know which questions you're particularly referring to, but we have got to require all of the jurors to do this, and I'm afraid you can't be an exception. So I'm going to need to send you somewhere where you can answer these as quickly as you can and give these back to us.[3]

Petitioner questioned the appropriateness of the specific questions concerning "how much money I make, what kind of car I drive, what church I go to, what religion I am, what political party I am in." Petitioner asked what would happen if she refused to answer those specific questions in writing.[4] The court replied that he did not like the questions either but the attorneys were entitled to answers to those questions. The judge told petitioner he would hold her in contempt if she refused to answer the questions.

---

1. N/A denotes the response of petitioner.

2. The parties have stipulated that this specific question was overlooked by petitioner. Petitioner attempted to clarify this in her state application for writ of habeas corpus. Thus, the remaining twelve questions are at issue in this petition.

3. The record demonstrates that the trial court was not aware of the specific questions at issue at the time of the hearing. The court did have petitioner's letter before him.

4. Petitioner relayed at the evidentiary hearing that the fear of placing the specific answers in writing concerned her because of her experience in an office environment. Specifically, petitioner contends that the document would be subject to disclosure to unintended persons despite the assurance of confidentiality by the court. This court notes that such non-intended disclosure is certainly possible in court proceedings. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

Petitioner asked "can someone tell me what relevance those questions have?" The court replied:

> Well, I'm not sure that they would be relevant to a particular case except it gives the attorneys for both the State and the Defendant an opportunity to get an overview of what kind of person you are, what your economic financial status is, which is not extremely relevant in my opinion in most cases, but mainly to give them an idea of what kind of person you are where they can make an intelligent decision in whether or not to exercise one of their peremptory challenges. And that's basically what it is.

Petitioner continued to refuse to answer the questions due to the lack of relevance. Petitioner was excused and the trial court continued the hearing with the lawyers present. The judge noted that he had known the petitioner and she had no legal standing to refuse to answer the questions. The state opined that in his two years of practice before the court, he had always done what the court instructed him and thought petitioner's refusal was an insult to the court. The state also noted that they intended on excusing petitioner from jury service. Mr. Podgorski opined that petitioner would probably be excused but "if the Court tells her to do it, she should do it or suffer the consequences."

The trial court had petitioner brought back into court. The judge informed petitioner of the possible penalty for contempt. Petitioner replied that "I'm not on trial so—I going to decline, Judge. I'm sorry, I'm going to decline." The trial court held petitioner in contempt and asked her to leave the court room while he considered punishment. The court asked the attorneys what procedure should he follow. The attorneys agreed to dismiss petitioner from jury service after the court sentenced her. The trial court sentenced petitioner to three days in jail and a $200 fine for the contempt. The jail term was to begin on February 9, 1994.

5. This order is factually flawed. Question no. 7 on the order stated "Have you read any articles or seen any television shows relating to the death penalty Yes ( ) No ( )." The court stated peti-

On February 25, 1994, the trial court signed a third amended judgment of contempt. The order stated petitioner failed to answer fourteen questions on the jury questionnaire.[5] The judgment ordered petitioner confined on March 9, 1994. On March 9, 1994, petitioner submitted an application for writ of habeas corpus with the Texas Court of Criminal Appeals. Petitioner was released upon bond due to the pending application. In the state application, petitioner asserted:

1. Petitioner has a constitutional right of privacy in refusing to answer specific questions which are not shown to be relevant.

2. The trial court abused it's discretion in holding petitioner in contempt.

3. Petitioner did not receive statutory warnings prior to being held in contempt.

Based upon the record, the Texas Court of Criminal Appeals denied the application on September 7, 1994. Justice Miller allowed that he would set the matter for oral argument "with an eye towards granting relief to petitioner." Justice Baird also would have allowed oral argument on the first two issues. Petitioner was ordered to begin serving her three day jail term on September 19, 1994.

Petitioner filed the instant petition on September 15, 1994. The Honorable Paul Brown, United States District Judge, granted a stay of execution of the sentence and referred the matter to the undersigned. On January 27, 1995, the parties consented to the disposition of the petition before this court.

### The Writ and Exhaustion

Petitioner brings the current petition asserting she was denied due process and her right to privacy in the contempt proceedings. These claims were presented in the state application for writ of habeas corpus to the Texas Court of Criminal Appeals.

tioner failed to answer this question. The trial court corrected this mistake in a nunc pro tunc third amended judgment of contempt on April 29, 1994.

## Analysis

Clarence Darrow stated a juror's "nationality, his business, religion, politics, social standing, family ties, friends, habits of life and thought; the books and newspapers he likes and reads" are all important subjects for questioning potential jurors.[6] Petitioner asserts that an attorney's probing into personal matters must stop at a point beyond relevance to the proceedings of the particular case to be tried.

### A. The Search for an Impartial Juror

The search for an impartial juror is a balancing effort by the court between the competing parties, the public and the potential juror. Without proper consideration of the rights of each of these interests, the jury will not be the solid cornerstone of our trial system that it must be.

Within this framework, the competing parties often attempt, during voir dire, to tilt the balance in their favor by securing partial jurors who may be sympathetic to the parties specific point of view. In order to balance the attempt to secure a partial juror over an impartial juror, the court is often called on to determine the bounds of the inquiry made by the parties during voir dire. Additionally, the public demands access to court proceedings. This public access may, and often does, present a potential intrusion upon the juror's expectation of privacy which must be protected by the court.

"Questions as to the trial procedure to be adopted in any particular case must, of necessity, depend upon the issues raised in that specific case." *United States v. Barnes*, 604 F.2d 121, 137 (2nd Cir.1979). A factor that should be considered on the issue of impartiality is the magnitude of the claim or punishment at stake in the specific case. In a case, such as the present one, where the jury will potentially be presented with deciding whether a person should live or die for a specific crime this factor would be paramount. Since both parties have a great deal to lose there may be very few *relevant* ques-

tions that should not be permitted even though they violate a prospective juror's privacy rights. *See Aldridge v. United States*, 283 U.S. 308, 314, 51 S.Ct. 470, 473, 75 L.Ed. 1054 (1931). However, a determination of the relevancy of the inquiry and a balancing of the competing rights must be performed by the court. While the parties have attorneys to champion their rights, the court must protect the privacy rights of the prospective jurors.

### B. Defendant's Right to an Impartial Jury

The Sixth Amendment guarantees "the accused shall enjoy the right to a speedy and public trial, by an impartial jury." The selection of an impartial jury entails the theoretical selection of persons free of bias or prejudice to either party. Courts have long recognized that "it is certainly much to be desired that jurors should enter upon their duties with minds entirely free from every prejudice." *Queen v. Hepburn*, 7 (U.S.) Cranch 290, 297, 3 L.Ed. 348 (1813) (CJ Marshall). However, the focus in jury selection is often an exercise by competing parties in securing a very partial jury favorable to one side over the other.

Efforts by the courts in securing an impartial juror have focused on what would constitute impermissible partiality. Courts have used the Fourteenth Amendment right to equal protection and due process as an engrafted feature of impartiality. In *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880), the Supreme Court held the equal protection clause of the Fourteenth Amendment protected a black criminal defendant from trial by a jury selected exclusively from white males. In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) the Supreme Court incorporated the Sixth Amendment right to an impartial jury into the Fourteenth Amendment right to due process, thus applying the Sixth Amendment right to the states. The resulting framework allows that potential grand jurors or petit jurors cannot be discriminated against based

---

**6.** *See* Darrow, *Attorney for the Defense*, Esquire Magazine, May, 1936, *as cited in United States v.*

*Barnes*, 604 F.2d 121, 134 (2nd Cir.1979).

upon race or sex either during selection or peremptory exclusions.[7] Thus, courts have used inclusion of a fair cross-section of the community as the measure by which impartial juries are judged.

The erosion of the use of peremptory challenges has raised splintered arguments on the continued viability of the peremptory challenge as a method of securing an impartial jury. Justice O'Connor asserts the use of peremptory challenges should only be viewed as an equal protection issue when exercised by the state. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. at ——, 114 S.Ct. at 1432. Justice Marshall argued in *Batson* that the use of peremptory challenges should be abolished to avoid the possibility of discrimination. *Batson v. Kentucky*, 476 U.S. at 108, 106 S.Ct. at 1729. Thus, the current trend towards an impartial jury requires extensive voir dire to form a basis for non-suspect peremptory challenges from an ever increasing cross-section of the community.

### C. Juror's Constitutional Right to Privacy

■ A person may lose his expectation of privacy with respect to certain matters by taking an action that opens those matters to public scrutiny. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 459, 97 S.Ct. 2777, 2798, 53 L.Ed.2d 867 (1977). However, nothing about becoming a prospective juror amounts to a willing waiver of an expectation of privacy. "[P]rospective jurors do not seek out the public forum; they are summoned; often unwillingly, to fulfill a public duty in the justice systems."[8] Thus, the court is responsible for balancing the competing interests and must be able to curb the inquiry in the jury selection process at the point relevance to the juror's impartiality ceases.

The question presented by the instant petition concerns the length to which counsel is allowed to inquire into a juror's private affairs in order to ascertain what prejudices and beliefs a potential juror is bringing to the proceedings in order that counsel may intelligently exercise peremptory challenges or challenges for cause.

In criminal trial proceedings there are several competing interests. The trial court enters as the median between the competing adversaries and is charged with ensuring the rights of the accused. The accused, although not a willing participant, is brought in with a host of rights, which include that of an impartial jury. The state is often the aggressor in criminal proceedings, in bringing the criminal charges and prosecuting the accused before the court. The public is present with a common law right to open proceedings. Among all of the adversarial proceedings and competing rights is thrown the ordinary citizen as a potential juror and prospective judge. The juror may receive a summons commanding that he or she appear at a time certain for potential jury duty. Absent specific statutory exceptions, the potential juror must attend the proceedings or face the possibility of criminal or civil sanctions. The potential juror then becomes a "witness to a process whose chief purpose is all too frequently to compile as prejudiced a jury as possible, with each side skillfully using challenges to alter the jury persuasion in favor of its client."[9]

Petitioner's present claim of asserting her privacy rights in the refusal to answer certain questions during voir dire appears to be a question of first impression in the courts. A historical review of a defendant's right to question jurors generally focuses on the right to an impartial jury. The rights of the potential juror are often overlooked and have been rarely, if ever, asserted prior to petitioner's current stand.

■ A historical development of the law in this area is germane to the present disposi-

**7.** *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (peremptory challenges based upon gender); *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (peremptory challenges based upon race).

**8.** Comment *The Right to Privacy of Prospective Jurors during Voir Dire* 70 Cal.L.Rev. 708 at 712 (1982).

**9.** Comment *The Right to Privacy of Prospective Jurors During Voir Dire* 70 Cal L.Rev. 708 at 722 (1982).

tion of this matter. On November 4, 1890, James Connors entered an election site in Denver, Colorado. Connors seized the ballot box by force and left. The Government charged Connors with interfering with a congressional election. Connors requested to submit seven specific questions to the potential jurors concerning the political affiliation and beliefs. The trial court refused to submit the questions and once convicted, the defendant appealed. The Supreme Court stated:

> It is quite true, as suggested by the accused, that he was entitled to be tried by an impartial jury; that is, by jurors who had no bias or prejudice that would prevent them from returning a verdict according to the law and evidence. It is equally true that a suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.

*Connors v. United States,* 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895). And with this concept, this court is in total agreement. Trial courts must be given great latitude in allowing or limiting voir dire. However, the court, while protecting the rights of the accused, the government, and the public must also protect the privacy rights of the prospective juror.

■ The limits of a suitable inquiry into a juror's bias and prejudice have troubled the courts with piece-meal results. The trial court has a duty to determine the question of actual bias. *Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950). Questions concerning race and racial bias have long been recognized as appropriate areas of inquiry where race is an issue in a criminal proceeding. *See Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). Religion has often been a question of prospective jurors. However, when religion is unrelated to the issue at trial it is not a proper subject for inquiry. *United States v. Barnes,* 604 F.2d 121 (1979); *United States v. Daily,* 139 F.2d 7 (7th Cir.1943).

When an alleged crime concerns war protests, attitudes towards war is an appropriate inquiry. *United States v. Dellinger,* 472 F.2d 340 (7th Cir.1972). Ethnic background is not a proper inquiry when it does not relate to the issue at trial. *United States v. Barnes, supra.* The gist of the history of selecting fair and impartial jurors allows that if the issue is relevant to determining the bias or prejudice of a prospective juror then the question is proper. However, jury selection is "not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case." *Schlinsky v. United States,* 379 F.2d 735, 738 (1st Cir.), *cert. denied,* 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967).

■ A juror cannot be held in contempt for refusing to serve upon a jury or refusing to answer questions when the service or answer would interfere with a constitutional freedom. *See United States v. Hillyard,* 52 F.Supp. 612 (E.D.Wash.1943) (refusal to serve upon religious grounds); *Bobb v. Municipal Court,* 143 Cal.App.3d 860, 192 Cal. Rptr. 270 (1983) (refusal to answer questions based upon equal protection); *In re Jenison,* 267 Minn. 136, 125 N.W.2d 588 (1963) (refusal to serve upon religious grounds). The issue presented by petitioner concerns the extent to which a juror may claim a right to privacy in refusing to answer juror questionnaires.

■ A juror's expectation of privacy was first endorsed by the Supreme Court in *Sinclair v. United States,* 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938 (1929). In *Sinclair* the defendants appealed a contempt conviction for employing private detectives to shadow jurors during the defendants' criminal trial on conspiracy charges. The trial court found the employment of the detectives tended to obstruct the administration of justice. In upholding the convictions the Supreme Court stated:

> The mere suspicion that he, his family, and friends are being subjected to surveillance by such persons is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration. If those

fit for juries understand that they may be freely subjected to treatment like that here disclosed, they will either shun the burdens of the service or perform it with disquiet and disgust.

*Id.* 279 U.S. at 765, 49 S.Ct. at 476. Converting this expectation of privacy into a constitutional right is not delineated in the Constitution. However, the Constitution does create "zones of privacy" in the expectation of the fulfillment of the delineated constitutional rights. *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965).

 Constitutional privacy rights are divided into two areas. The first concerns the individual interest in independence in making some kinds of important decisions. The second, and the one petitioner claims, is the individual's interest in avoiding disclosure of personal matters. *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). This right to privacy might best be described in terms used by Justice Brandeis as the "right to be let alone" and is the right considered "the right most valued by civilized man." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928).[10]

"It is not, after all, the prospective jurors who are on trial in the cases that come before the courts. It can be imagined that, as counsel seek more and more information to aid in filling the jury box with persons of a particular type whom they believe to be well disposed toward their clients, prospective jurors will be less than willing to serve if they know that inquiry into their essentially private concerns will be pressed."

*United States v. Barnes,* 604 F.2d at 140.

### D. Public's Right of Access to Jury Information

Petitioner's concern for her privacy is an avoidance of the disclosure of private information to the public. Petitioner stated that the information sought is the type of infor-

mation that she would not tell anyone. The respondent demonstrated that pieces of the information sought with regards to type of car, political affiliation and personal wealth were discernable from public records. While the defendant in a criminal trial may certainly seek relevant information to determine bias or prejudice, a corresponding interest is the right of the public to open proceedings in criminal trials.

In *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Supreme Court noted that the public has a right to open proceedings in criminal trials which would include voir dire. In considering the competing rights of privacy for the juror and the right to a fair and impartial trial for the defendant the court stated:

To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record.

*Id.* 464 U.S. at 512, 104 S.Ct. at 825. This method would ensure the right of the public to access to the proceedings but allow the court to seal records of proceedings concerning private matters.

### E. Trial Court's Duty in Jury Selection

 It is the duty of the trial court to see that no collateral or unrelated issues are brought into the case during voir dire. *United States v. Daily,* 139 F.2d at 9. "the obligation to impanel an impartial jury lies in the first instance with the trial judge ..." *Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). Stated differently, the judicial duty is "to do what was reasonably practicable to

---

**10.** For an academic discussion of a juror's right to privacy *See* Comment, *The Right to Privacy of Prospective Jurors During Voir Dire* (1982) 70 Cal L.Rev. 708; *The Defendant's Right to an Im-*

*partial Jury and the Rights of Prospective Jurors* (1979) 48 U.Cin.L.Rev. 985; Comment *Voir Dire Limitations as a Means of Protecting Jurors' Safety and Privacy* (1980) 93 Harv.L.Rev. 782.

enable the accused to have the benefit of the right of peremptory challenge or to prevent unfairness in the trial." *Bailey v. United States,* 53 F.2d 982, 984 (5th Cir.1931).

The increased use of the social sciences in jury selection has presented an additional burden upon the court in determining what is relevant inquiry for the purpose of exercising peremptory challenges. Social scientists make varying claims as to the success of using their patented techniques in securing the ultimate biased jury. "Regardless of the present ability of social scientists to pick a jury, however, at some point, as their theoretical understanding of human behavior increases and their practical ability to identify subconsciously biased jurors does likewise, the courts will have to face the issues raised by their involvement in jury selection." [11]

The trial court has the duty set out in *Press–Enterprise.*[12] That is, the court must balance the competing rights of the public, the defendant and the prospective juror. In order to ensure proper balance, the trial court should perform a simple two-step process that will ensure the proper weighing of the various interests. First, prior to the submission of any proposed questionnaire to potential jurors the court should screen the questions to determine what questions should be excluded based upon lack of relevance to the matter at hand.[13] The parties would then be notified of the excluded questions and allowed to demonstrate relevance. "When the matter sought to be explored on *voir dire* does not relate ... it is incumbent upon the proponent to lay a foundation for his question by showing that it is reasonably calculated to discover an actual and likely source of prejudice, rather than

pursue a speculative will-o-the-wisp." *United States v. Robinson,* 475 F.2d 376, 381 (D.C.Cir.1973). Once relevance could be established to the trial court's satisfaction, the amended questionnaire could be forwarded to the potential jurors.

The second step would then involve the potential juror answering the questionnaire or oral questions proposed during voir dire. In the questionnaire or at voir dire the court should put the juror on notice concerning their right to non-disclosure of private matters.[14] Once the juror invokes the right to privacy on an issue, the court must weigh the relevance of the issue sought by the defendant. If the issue is relevant but entails a private matter, the court should enter into an *in camera* proceeding where the juror is allowed to answer the question in the presence of the court and the attorneys.[15] The court may then seal that specific portion of the record concerning the private matters discussed. This allows the public the maximum exposure to the proceedings without the disclosure of private matters which would interfere with the juror's ability to serve.

### F. Application to Petitioner

To determine the outcome in this case, the Court must examine the competing interests involved. Petitioner may have a constitutionally protected right to nondisclosure of matters deemed to be private, if that right is not out-weighed by the rights of the parties to an impartial jury. Petitioner should not lose her expectation of privacy merely by becoming a prospective juror. James Lee Clark, the criminal defendant, also has a competing interest in enjoying his right to a trial by an

**11.** Gobert, James *In Search of the Impartial Jury* 79 J.Crim.L. & Criminology 269 at 272 (1988).

**12.** "Judges, not advocates, must control that process to make sure privileges are not so abused." *Press–Enterprise,* 464 U.S. at 510 n. 9, 104 S.Ct. at 824 n. 9.

**13.** The federal courts screen questions as a matter of routine in both civil and criminal trials. *See* Fed.R.Civ.P. 47(a), Fed.R.Crim.P. 24(a).

**14.** The petitioner presented the testimony of a jury selection expert, Robert Hirschhorn, who

testified that the design of the questionnaire and accompanying instructions may best be used to ensure accuracy of the answers and the privacy of the juror.

**15.** Some might argue that a criminal defendant has the right to be present during these sensitive *in camera* hearings. However, the disclosure of sensitive private issues to a criminal defendant would most certainly cause concern and lack of candor on the part of the potential juror. *See Barnes,* 604 F.2d at 141.

impartial jury. Additionally, the public has an interest in keeping the proceedings open.

These competing interests must be balanced to determine whether a prospective juror should have to answer questions which are deemed to be private in nature. The questions involved in the case should have been examined to determine whether they were relevant to the underlying criminal case. The questions posed to petitioner must have some relevance to the question of whether she should be qualified or disqualified from jury service in this case because of bias or prejudice. If the questions are not directed to procure this type of information, the questions should not be presented to the prospective juror and the issue of privacy will not arise.

If the trial court finds that the questions are relevant to the question of bias or prejudice of a prospective juror, and the prospective juror raises her privacy right, the trial court should conduct an *in camera* hearing to determine what is the least intrusive means to procure the information and protect the rights of the prospective juror. In determining whether the prospective juror should be required to answer the questions posed, the trial court must balance the competing interests of the prospective juror, the criminal defendant, the prosecution, and the public.

Petitioner's specific circumstances do not report a proper balancing of her right of privacy in relation to the rights of the public and the parties. The trial court should limit voir dire when the parties seek information too remote from the issues in the case to warrant invasion of the potential juror's private thoughts. *Barnes,* 604 F.2d at 140.

Some of the questions posed to the petitioner were personal and may have impinged on her privacy rights. Petitioner expressed a concern that the information, although under seal, would not be kept confidential. An additional concern of many prospective jurors is that a criminal defendant would possess this private information which could pose a risk of harm to the prospective juror or his or her family.

## Conclusion

Petitioner was not advised that private matters could have been discussed *in camera.* In addition, the relevance of the specific questions at issue was never considered or established. The trial court's failure to determine the relevance of the questions and conduct a balancing test of the competing interests, entitled the petitioner to refuse to answer. However, a potential juror is certainly not free to refuse to answer any question propounded when it is found by the court to be relevant, or potentially relevant, and a balancing of the competing interests is performed. If a trial court determines that a specific question is relevant and after conducting a balancing of the competing interests determines that the prospective juror's privacy rights are outweighed by the other interests, the prospective juror cannot refuse to answer the question. However, the court should provide the prospective juror with the least intrusive means to provide that information.

Given these facts, petitioner's contempt must be set aside as a violation of her First and Fourteenth Amendment rights to privacy. A final judgment will be entered separately from this memorandum opinion.